Case number 20-1754, United Mine Workers of America 1974 pension plan et al. v. Energy West Mining Company appellant. Mr. Roth for the appellant, Mr. Killian for the appellees. Good morning Mr. Roth. Good morning, may it please the court, Jacob Roth for Energy West Mining Company. Your honors, the actuary for the pension plan here expects the plan's invested assets will return seven and a half percent on average per year. And the actuary uses that seven and a half percent investment return assumption in order to present value the plan's future benefit obligations when determining the plan's minimum funding requirements. But when it comes to withdrawal liability, the actuary measures the present value of those same future benefit liabilities using the risk-free PBGC rates. Here we're about 2.7 percent, even though he does not use those PBGC rates for any other purpose and even though they have nothing to do with the plan's anticipated experience. That change here nearly tripled the appearance of the plans under funding and therefore nearly tripled Energy West's liability. Mr. Roth, if we agree with you on the best estimate question, should we skip the identicality question like the Sixth Circuit did? Well, your honor, there are independent grounds for the same outcome here, which is to use the seven and a half percent rate of return. I mean, I'm not going to tell the court which ground to use here, whether it wants to reach both or or not. I mean, I think they're both important for actuaries to understand the constraints they face. But should I, can I take from your answer then that assume that I agree with you on the best estimate ground. Assume that I think the identicality question is hard and that as a general rule of court ought not make, decide more law than is necessary to decide the case. You don't see any significant downside to us going the route of the Sixth Circuit and hunting on the identicality question and ruling in your favor on the best estimate question. Is that correct? That's correct, your honor, certainly for this case. I mean, there are situations in the future where it could make a difference. In this case, it wouldn't. In this case, it gets you to the same place. Let me, if you'll bear with me for something of a winding question, but then I'll get out of your way and get out of my colleagues way. Imagine this is what I think. Tell me whether I'm on track or off track here. The best estimate of anticipated experience means just about what it says. That means exactly what it says. The actuary has to project what he thinks the plan will do. And we know the actuary's best estimate in this case, it's 7.5%. And an actuary can only have one best estimate. There's only one best. But that prediction can be a range. It can have something of a confidence interval, you know, 95% confidence, you know, from here to here, and then you've got outliers. And within that confidence interval, reasonable actuarial methods allow an actuary to be more cautious in calculating withdrawal liability than minimum funding liability. Almost certainly, it doesn't allow the actuary to do what the actuary did here and depart from 7.5% as much the actuary did. But there is a range that's acceptable. And where an actuary lands on that range doesn't have to be exactly the same for the minimum funding liability and the withdrawal liability. Do you think there's something to that? Well, Your Honor, if you put aside the concrete pipe point, and the idea that they have to be consistent, then yes, I agree with Your Honor, that that would be the right way to look at it. Now, we think that because of concrete pipe, the best estimate of anticipated experience really does have to be the same in the two contexts. That's what the court said, used the term necessity and must be used for other purposes as well. So that's the real reason why we think they need to be the same. But if you put that aside, and you just look at the language of, then yes, I agree, you could have, it's not a single number, it's a range, there's a certain amount of professional discretion and deference that we give to the actuary, so long as they're trying to do the right thing, right? They're trying to measure anticipated experience. And maybe in one context, they try to measure it in a little bit more conservative a way than in another context. And that would still be fine. Of course, that's not at all what happened here, which is sort of the key point for this appeal. Here, he said, I don't care about plan experience. I'm not interested in it. I'm just picking this off the shelf benchmark rate that is risk-free, that represents returns on hypothetical portfolio of treasuries or corporate bonds. That's not what the statute tells the actuary to do. And so that deference that we would otherwise give to the actuary doesn't kick in, as Judge Larson explained in Sofco last month. He's just doing the wrong thing, and he can't isolate himself from review by saying, well, I was reasonable in doing something the statute didn't tell me to do. Mr. Roth, your argument for the idea that the withdrawal rate, minimal funding rate, should be the same rests largely on concrete pipe. But I'm not sure that your argument is so solid when you look at the actual text of the statute. I mean, the language that's used in those provisions is different. And so I'm wondering, what is your argument concrete pipe was decided before these statutory amendments? So where would we find within the statute the idea that the rates must be identical as a matter of law, which is what you are arguing? Sure. Yeah, Your Honor. So there is a part of the statute that remains identical across the two, which is the language actuary's best estimate of anticipated experience under the plan. That language appears verbatim in these two sections. Change that occurred since concrete pipe is that for minimum funding, each individual assumption also must be reasonable, whereas for withdrawal liability, they have to be reasonable in the aggregate. Isn't that a meaningful difference? It is a meaningful difference in this sense. And sort of leading case on this, that language in the aggregate language is basically functioning as a sort of harmless error rule for assumption. So if you have an assumption that's wrong, but it's offset skewed one way, but then there's another assumption that skewed the other way and the court can conclude or the arbitrator can conclude it basically comes out in the wash, then the employer is not entitled to relief. And so I think that is a difference between the two contexts. But it's not a difference that matters here because nobody has argued or even suggested that there's any offset here when this interest rate assumption inflated the liability by somewhere in the neighborhood of $75 million, tripling what it otherwise would have been. So I think there is that difference, but I don't think it comes into play in a case like this. That doesn't support your argument that they should be an identical rate. I think it's that they should be identical, but if they're not, and it's in a way that is essentially harmless, then you can't get relief from that. So that's where I would say the difference comes in terms of when you're entitled to relief from that deviation. I'm taking you back to the Sixth Circuit for a moment. Judge Larson, if I recall, and I don't have the case in front of me, went rather far and declared that Segal blend to be the method of operating in that context. Would the record in this case support such a decision on our part here? So Judge Larson said that the Segal blend, which is when you mix the funding rate and the PBGC rate, she said comply with the statute. This case is actually a fortiori because they didn't even blend it. They just said we're just doing the PBGC rate, we're ignoring the actual anticipated plan experience. So I think this case actually is stronger and the same conclusion would follow, which is the PBGC rate, unless the actuary is going to come in and tell you the plan is actually planning to sell off all of its stocks and buy annuities, the PBGC rate is not an appropriate assumption to use. Now the plan actually in its response, the SOFCO sort of gestures in that direction and says, oh, actually, PBGC rates here really do represent plan experience because we're going to sell off everything. That's just not what the actuary testified here. It's not what the arbitrator found. It's not what the district court held. I guess what I may be really trying to ask you is, if we decide that your claim is correct, is valid, do we strike the computations and send it back for a whole reprocessing, or do we have some method of reaching a definitive result on the record we have now? Sure, yes, your honor. Well, there isn't any dispute in the record that this actuary's best estimate of the plan's investment experience was seven and a half percent. I mean, he said that the plan admits that in its brief, so that's undisputed. And so if that's the right measurement, if that's what the actuary is supposed to be computing, then it's as easy as saying you recalculated at seven and a half percent. That's what the court did in SOFCO. That's what the court did in New York Times Company. That's sort of the standard because there isn't an alternative that's been offered. Well, Mr. Roth, if I could just follow up on Judge Sentel's question about remedy. So if we agreed that the rate that was used here is unreasonable because it's unlawful and not consistent with the statute, but we do not agree, or we want to hold the question about whether it has to be identical, what does the remedy look like in that case? We refer to the district court, we remand for the arbitration award to be vacated, and then does the actuary calculate a new rate under the statutory term? What exactly would happen in your view? Well, in our view, Your Honor, the actuary was clear that seven and a half percent represented his best estimate of anticipated plan experience. He didn't say it's a rate. That was the number he gave, and that's what the plan says in the brief. That's their investment return assumption. So if you agree with our construction of the statute, the investment return assumption is the relevant metric of anticipated experience in this context, then it's as simple as saying, yes, the judgment below is reversed with instructions to vacate the assessment and have it recalculated by the fund using the seven and a half percent investment return assumption. Again, that's been the case in the other cases that have followed this logic. Are there other assumptions that an actuary might use in the context of a withdrawal calculation that are different? Different from minimum performance, right? That was the only one here that was different. So in other words, he said, actually said, yeah, I use the same assumptions except for on investment return where I switch to risk-free because, you know, he thinks it's a policy matter. That's a more fair way of doing it, which, you know, I understand, it's just not what Congress directed. Do my colleagues have any further questions? Thank you, Your Honors. Thank you. Good morning, Your Honors, and may it please the court. I'm Brian Killian on behalf of the 74 plan, and I'd like to start with the Sacco decision, same as the court in Energy West did. In that case, the Sixth Circuit did not hold that categorically it is impermissible for an actuary to use risk-free rates when discounting in this context. What the Sixth Circuit held more narrowly was that you may not use risk-free rates when risk-free investments are not part of the plan's anticipated experience. But if ever there was a plan that anticipated risk-free investments in the future, it was the 1974 plan. In 2015, it was among the worst off multi-employer plans in the United States. And so every single actuary in this case, including Energy West's own actuary, Mr. Hittner, testified that the looming financial distress of this plan warranted using a rate that was less than the 7.5% return rate that the plan had been earning in the short term. You see, Judge Walker, there's a difference between the 7.5% that the plan was earning on its current investments in the mid-2010s versus what the plan was expected to earn in the long run because the plan was going to have to change its investment mix. What it was currently invested in in the mid-2010s was not sustainable in the long run because the plan was facing insolvency. And so Energy West- I thought, and it sounds like you're saying I just misunderstood it, which is just perfectly possible. I thought that the 7.5% was supposed to be the actuary's best estimate of not just what would be earned the next year, but that what would be earned each year forever on average. I see Mr. Roth nodding his head. So Mr. Roth, we'll get to you in rebuttal. Yeah, so we- Mr. Killian, what do you think? We disagree with that characterization of the 7.5%, Judge Walker. What the 7.5% represents is if you take the plan's current investment mix, and by current, I mean mid-2015, and project that investment mix forward, what is that investment mix anticipated to return? And in the annual minimum funding context, that is the question that the actuary is tasked with deciding. If the plan stays on this trajectory, keeps its investment mix, what is it expected to return in the long run? But in the withdrawal liability context, the plan, excuse me, the actuary does not take for granted that the current investment mix will remain the initial inquiry and a separate threshold decision of what kind of investments will this plan be able to tolerate in the long run. And as I was saying, every actuary in this case understood that come 2022, the plan was going to be insolvent. It was not going to be able to sustain or bear market return that it was able to get in the mid-2010s. And that is why the arbitrator in this case found as a fact that the approaching insolvency, quote, the plan, excuse me, because of the approaching insolvency, quote, the plan will certainly not be able to take the increased risks associated with investments with higher returns. This is on page 239. Did you make this argument before the arbitrator that, well, let me ask this. Did you argue something of the opposite in front of the arbitrator? Did you argue that the impendency insolvency should not matter? No, we argued, we argued, we defended this, the, the PBGC rates on multiple grounds. The ground, you know, as your honor noted, that is permissible under the actual standards of practice, but we also defended it after Energy West interjected the best estimate argument, which wasn't until after the hearing. And after the New York Times decision, the arbitrator let us introduce supplemental briefs. And it was at that time that Energy West for the first time proposed a best estimate argument because Judge Sweet in the Southern District of New York was the first judge to sort of accept an argument along these lines. And it was in that context where we pointed back to some of the evidence that had been adduced in the earlier part of the hearing and said that, you know, we would satisfy it because of the looming insolvency. And I think it's important your honor to note that Energy West's own actuary also agree that a rate below seven and a half percent was warranted because of the proposed rates ranging from 3.8% all the way to six and a half percent. This is at pages 172 to 174, the joint appendix, all because of this looming insolvency. And so that factual finding that the arbitrator accepted, we think is dispositive under the Sixth Circuit's construction of SOFCO. Moreover, it is the same key fact and the same logic that this court upheld in the Combs versus Classic Coal case in an opinion written by Judge Chantel on behalf of the court. In Combs, the plan was the 1974 plan, the same one that's before you today. And it used a discount rate that was four percentage points below its current investment return rate. It was a five and a half percent discount rate for withdrawal liability and its current investment returns were nine and a half percent. And the court nonetheless upheld, this court upheld that that discrepancy was, I'm sorry, Judge Rao. Yeah. So, I mean, some of these arguments go to the idea that the rates need not be identical because perhaps a looming insolvency, you know, affects the assumptions that should be made for withdrawal liability. But that doesn't necessarily go to why the actuary imposed the risk-free PBGC rate, which is quite low and is not necessarily connected directly to the looming insolvency. So perhaps you're correct that they shouldn't be identical, but that doesn't explain why the risk-free PBGC rate is an appropriate one under the statutory term. A two-step analysis, Your Honor. I mean, the first question is what is the plan's future investment portfolio going to look like? Then the second question is what is the appropriate rate? Mr. Rushow, Mr. Hittner, that was Energy West Actuary, and Mr. Krah, who was our expert actuary, all agreed the plan's future investment portfolio was not going to look like its 2015 investment portfolio. And that's because the plan was spending $500 million a year on benefits and had approximately $3 billion in assets. Future investment portfolio, where do we find that language? That specific language isn't used. But what Mr. Rushow talked about at pages 69, 76, and 78 of the joint appendix, he said, excuse me, he said PBGC rates are future return assumptions. He said that that's page 76. He said the market rate is effectively the PBGC rate, that's at page 78. And at page 69, he explains why he uses a different rate for the annual minimum funding context. The statute talks about anticipated experience, right, which is both looking forward to what might be anticipated, but also experience, which is backwards looking as to what type of investment mix the plan has had, or what type of performance it's had in the past. So you seem to be focusing only on future investment, you know, the future investment mix. But what about the fact that there's also sort of a backward looking component to what the actuary has to consider? Well, Your Honor, there's in the aggregate reasonableness, parenthetical, there's a specific reference to the past experience and the reasonable expectations. And then the best estimate requirement refers just to anticipated experience. What Mr. Rushow testified to at page 69 and 70 of the joint appendix is that what the plan was invested in in 2015 was not going to be its investment portfolio in the future. And that was the anticipated experience that he was addressing and why he chose the PBGC rates. As I was saying, the plan's $3 billion in assets were expected to be liquidated over the next six years because it was spending $500 million a year on benefits. And so everyone agreed that by 2022, the plan's investment portfolio was not going to consist of equities that were returning approximately 7.5% in the mid 2010s. It was going to look radically different because the plan needed to be highly liquid in order to continue paying $500 million a year in benefits. And I wanted to point out before the time runs out that this was the exact logic that the court endorsed in the Combs versus Classic Coal case. The court said, quote, because of the weak funding position of the 1974 plan, the plan was unable, quote, to participate in the high interest rates in the long run. And so in 1991, when this court decided Combs versus Classic Coal, the discrepancy was 4%. Today, for Energy West withdrawal, the discrepancy was 5%. But that's a reflection of the fact that the 1974 plan's investment position has gotten only worse in the last 30 years. It is one of the worst off plans in the United States. Mr. Killian, can I just ask you the same question about remedy? So if we were to conclude that the rate here was unreasonable, but that it need not be identical to the other rate, what exactly would happen with the remedy? Would the actuary be required to calculate a new rate? I think that, yeah, we would ultimately need to get ourselves back in front of the arbitrator for that determination because, as I've said a couple times, Energy West's own actuary proposed four or five different rates. Our actuaries supported the use of the PBGC rates here. If your honors believe that they need not be identical, but that, for some reason, the 2.8% PBGC rates are not substantiated, then the record is unclear as to what the appropriate rate would be in this particular circumstance. Mr. Killian, your brief among its themes is a sort of policy theme that if somebody's gonna come out not ahead here, it ought to be Energy West because they're the ones who have chosen to withdraw. In other words, if someone is gonna have to put up money to minimize risk, it should be Energy West and not the plan. I wonder why this policy point isn't stronger. No estimate's perfect. When someone like Energy West withdraws from the plan and an actuary picks a withdrawal rate, there's gonna be a windfall one way or another, up or down. And as a matter of policy, the actuary really ought to just do his best to minimize the windfall, regardless of whether it's gonna be a windfall one way or a windfall another way, particularly because a company like Energy West is allowed to withdraw. My understanding is they're not writing new rules or withdrawing from a plan that they were never allowed to withdraw from. You're allowed to withdraw. When you withdraw, there are these rules. Actuary makes this estimate and you pay this much amount. So, why isn't the best policy here just the actuary should minimize what the windfall will be without worrying about who's more likely to get the windfall? Judge Walker, I think I didn't mean to leave the impression that our brief was based on policy, not rather than statutory text and the concrete pipe decision. Mr. Kelly, I want to apologize if I left the impression that I thought that was the only theme of your brief or even the main theme of your brief. Both sides make strong arguments with regard to the statutes and lots of other arguments. But I do think there's a kind of like good guy, bad guy. It's their fault for withdrawing. So, if somebody's gonna have to pay a little more, it ought to be them and not the plant. So, I'm just kind of pushing back against that a little bit and seeing what you think. So, here's what I'd say, Judge Walker. I think in the concrete pipe case, the Supreme Court understood that what Congress wanted in this context was deference to actuarial policy. I'm not an actuary. I don't set actuarial policy. I only can read the actuarial standards of practice, same as Mr. Roth and as your honors can. And the actuaries have decided that there is a range of options that are permissible for different actuarial and economic reasons in this context. You know, one is the settlement rationale. One is the investment return rationale. I wouldn't say that one is a penalty. You know, the actuary is encouraged to make an independent determination about which is the best one for that plan that he's considering. And so, for instance, our actuary, Mr. Rushow, in this instance, testified that he does not use the for many plans that are healthy. He uses the invest, the current investment return rate. And that's at pages 80 and 8 to 82 of the joint appendix. But this plan was in a uniquely bad position. And because it was in a uniquely financially bad position, it was uniquely likely to have a future return that actually included the PBTC rates. In other words, Judge Walker, I think the multiple policies that are articulated in the actual actuarial standards of practice intersect in this case. The future investment return rate and the settlement rate are basically the same thing for the 1974 plan. It's not that anyone is getting a windfall. It's just simply that this is a plan that was on the precipice. And before Energy West withdrew, as a result of the looming insolvency, its withdrawal liability was going to be very great as a result. Now, it's a large number. But as I said before, the plan spends $500 million a year on benefits. And so the $115 million withdrawal liability represents barely three or four months worth of the amount of money that this plan spends. This is a monstrous plan that has catastrophically large liabilities and an inability to pay for them. So, Your Honors, if I may conclude just real briefly, we haven't talked today about whether this court can review best estimate grounds under the statute. We've argued in our brief, without having questions on it, I guess I'll rest on the brief that the best estimate provision is not a basis for overturning an unfunded vested benefit determination. This court in Combs identified the only basis, and they were ratified by the Supreme Court in concrete pipe. The only question is whether, quote, the combination of methods and assumptions employed in the calculation would be acceptable to a reasonable actuary. 30 years ago in Combs, this court found that this very combination of methods was reasonable, and it is still reasonable. The arbitrator found it generally is still reasonable, and for this particular plan that was in such dire financial situations, it was especially reasonable, and it was the best estimate. So Judge Nichols' decision should be affirmed. Thank you, Mr. Killian. Thank you. Does Mr. Roth have any time remaining? Council had notes on remaining. We'll give you two minutes for rebuttal. Thank you, Your Honor. It sounded from most of that discussion we're sort of in agreement, at least at this point, on the legal principle that the actuary is supposed to be projecting anticipated investment returns on the plan's assets, I guess in light of SOFCO. And most of the discussion was about whether he actually did that. Your Honor, I would point to page 79 of the joint appendix where the actuary was asked the question, when determining withdrawal liability, do you look at the investment mix of the plan? And he says, for withdrawal liability, no. This is not, this is, you know, this is just a post hoc argument. It's not what he testified. It's not even what the plan argued in their merits brief. The first sentence of part two of the plan's brief says that Rothschild, quote, did not consider the 1974 plan's investment returns, which is not what he was looking at. He was picking a risk-free rate because he thinks that as a policy matter, that's the right. I think Mr. Killian suggested that the actuary looked at the anticipated portfolio. Do you think that's what the actuary did here? There is zero evidence in the testimony of the actuary that he was looking at the plan's future investment returns on the plan's future investment mix. He said, I'm looking at risk-free returns on a risk-free portfolio. Never said the plan was going to buy a risk-free portfolio. There is no evidence that the plan was going to buy a risk-free portfolio and the plan has not bought a risk-free portfolio. The plan was going to buy a risk-free portfolio. The minimum funding rate would also have come down to 2.7% because you are using that rate to value the same liabilities at the same points in the future. They're 10 years, 15 years, 20 years off. And you're trying to figure out if you have enough money now to pay for those future benefits. If you thought you were going to be earning 2.7% a year, you would be using that to project the minimum funding needs. And he's not doing that. He's using 7.5%. There's no evidence that they've ever changed their investment mix or that the actuary cared one way or the other about that. And the insolvency also, by the way, is now totally a fiction because they've been bailed out. So there is no insolvency. It's all kind of just this made up argument to try to get within the scope of SOFCO. So for that reason, Your Honor, we think it's clear 7.5% is the actuary's best estimate of anticipated investment return. And if that's what the statute means and SOFCO held, then the decision below has to be reversed and the assessment needs to be recalculated. Thank you very much. The case is submitted.
judges: Rao, Walker, Sentelle